THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSHUA BOAND, Defendant-Appellant.

Second District No. 2—04—0387

Opinion filed November 16, 2005.

Ronald D. Menaker and John F. Grady, both of Arnstein & Lehr, of Chicago, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz and Joan M. Kripke, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BYRNE delivered the opinion of the court:

Following a jury trial, defendant, Joshua Boand, was convicted of the drug-induced homicide (720 ILCS 5/9—3.3(a) (West 2004)) and involuntary manslaughter (720 ILCS 5/9—3(a) (West 2004)) of Nicole Levin and the criminal sexual assault (720 ILCS 5/12—13(a)(2) (West 2004)) of Tavia Shepherd. The trial court sentenced defendant to concurrent prison terms of 20 years for drug-induced homicide, 5 years for involuntary manslaughter, and 11 years for criminal sexual assault.

Defendant appeals, alleging that several trial errors entitle him to

a new trial or a reversal of his convictions. He contends that (1) the trial court erroneously declined to sever the criminal-sexual-assault count from the homicide counts; (2) the trial court erroneously admitted evidence of other uncharged sex offenses that he committed before the night of the incident; (3) the trial court denied him the right to confront Shepherd and Paul Hoerer, his codefendant, about their motives to testify for the State; (4) the State failed to prove him guilty beyond a reasonable doubt of criminal sexual assault; (5) the trial court erroneously permitted the State to cross-examine another witness, Becky Goldman, about her telephone conversation with Shepherd three days after the incident; (6) the trial court erred in refusing to instruct the jury that suicide qualifies as an intervening cause of death that would relieve defendant of criminal liability for a homicide; and (7) the drug-induced-homicide statute is unconstitutionally vague and overly broad. The State addresses each of these issues and raises another, asserting that we must remand the cause for the trial court to impose mandatory consecutive sentences. We conclude that the trial court erred in denying the motion to sever the criminal-sexual-assault charge from the drug-induced-homicide and involuntary-manslaughter charges. This error was compounded by the erroneous admission of evidence of defendant's other sex crimes and the corresponding jury instruction. Therefore, we reverse defendant's convictions and remand the cause for further proceedings consistent with this opinion. This disposition also considers other issues raised in this appeal that might arise again on remand.

## I. FACTS

Defendant was charged by indictment with "committ[ing] the offense of drug-induced homicide in that he violated subsection (a) of section 401 of the Illinois Controlled Substances Act [(720 ILCS 570/401(a) (West 2004))] by knowingly delivering methadone, a controlled substance, to Nicole Levin and Nicole Levin thereafter died as a result of the ingestion of a portion of that methadone into her body, in violation of 720 ILCS 5/9—3.3(a) [(West 2004)]." Defendant was also charged with involuntary manslaughter in that he, "acting in a reckless manner, performed an act likely to cause death or great bodily harm to Nicole Levin, in that [he] failed to request emergency medical assistance for Nicole Levin, knowing Nicole Levin was suffering from a possible overdose of drugs, in violation of 720 ILCS 5/9—3(a) [(West 2004)]." Finally, defendant was charged with committing criminal sexual assault, in that he, "knowing Tavia Shepard [sic] was unable to give knowing consent, committed an act of sexual penetration with Tavia Shepard [sic], in that [he] placed his penis in the vagina of Ta-

via Shepard [*sic*], in violation of 720 ILCS 5/12—13(a)(2) [(West 2004)]."

By the date of her death, May 26, 2002, Levin was 19 years old and had a history of abusing antidepressants and street drugs including cocaine. In February 2002, Levin's relationship with her boyfriend ended and she suffered a miscarriage. From February 17, 2002, to April 2, 2002, Levin was hospitalized four times for attempting suicide and intentionally overdosing on alcohol and prescription medication.

Two days before her death, Levin, Shepherd, Paul Hoerer, and a person named Jason went to a drug party, where they ingested cocaine, marijuana, and muscle relaxers. Levin and Hoerer left to purchase more drugs, but Levin veered off the road and struck a tree, destroying her new car. Levin was treated for chest and back pain and released from the hospital. Hoerer also was treated.

On May 26, 2002, the date of the incident, Levin and Shepherd retrieved some of Levin's personal belongings from the car and returned to Levin's home, where they prepared to go out for the evening. Shepherd testified that Levin was noticeably upset about her recent breakup with her boyfriend and the damage to her car. Shepherd testified that Levin declared that "[s]he had nothing left to live for." In contrast, Levin's father testified that his daughter did not appear suicidal on the night of her death and, in fact, she expressed enthusiasm for her recent decision to enroll in nursing school.

Later that evening, Levin, Shepherd, and Hoerer went to the home of Hoerer's cousin where they all smoked marijuana. Levin also ingested Vicodin that Hoerer had been prescribed for injuries suffered in the car accident. Defendant and Jennifer Donfris, with whom he lived, arrived at the party a short time later. Defendant and Shepherd had dated briefly two years earlier. Defendant testified that, while they dated, he and Shepherd shared drugs and engaged in consensual sexual intercourse. Hoerer, who had been friends with defendant since childhood, testified that defendant told him that he planned to have sex with Shepherd that night and would "make it happen if he could get her back to his house." Hoerer waited approximately one year before disclosing defendant's statement to the police.

Shepherd, Levin, defendant, and Hoerer went to defendant's home between 8 and 9 p.m. Hoerer testified that the group went to defendant's home because Levin was "expressing \*\*\* in rather strong terms" that she wanted cocaine and defendant told her that he could provide it. Shepherd testified that she, not Levin, wanted drugs.

There is further dispute as to what occurred next. Shepherd testified that the four sat in defendant's living room, where defendant walked to a bookshelf and retrieved a hollowed-out book and a gray

lockbox. Defendant removed some small bottles from the lockbox, placed them on a glass table, and told the group that the bottles contained methadone and that methadone is a safer form of heroin. According to Shepherd, she drank only half of her bottle because she disliked the taste. The other three each drank an entire bottle, and when Shepherd placed her half-full bottle on the table, Levin grabbed it and ingested the remaining methadone in that bottle as well. Hoerer corroborated this portion of Shepherd's testimony.

Defendant admitted that he had been prescribed methadone to treat his heroin addiction and that he stored the bottles in the lockbox and the book. Defendant testified that he provided the group pills, but he denied providing any of the methadone that was ingested on the night of Levin's death. Defendant explained that he always left the key in the lock of the box and that Levin must have taken the methadone without his knowledge or permission.

Shepherd and Hoerer testified that Levin was disappointed and angry because the methadone was not getting her high enough. Levin became irate and demanded more drugs, including crack cocaine. Shepherd became uncomfortable with Levin's demands, so she left the party with defendant and went to the west side of Chicago, where they traded some of Hoerer's marijuana for cocaine. Shepherd admitted that she and defendant "might have kissed and touched each other" while in Chicago, but she denied engaging in sexual intercourse. Detective Raymond Peters testified that, the day after Levin's death, Shepherd told him that she engaged in a sex act with defendant while in Chicago. At trial, Shepherd denied making such a statement.

Defendant testified that he and Shepherd drove around Chicago using the cocaine, and at one point, Shepherd attempted to perform oral sex on defendant but did not because he could not achieve an erection. Defendant believed that Levin found and took the methadone at some point during the five hours that he and Shepherd were driving around Chicago.

Hoerer testified that, while he was alone with Levin, they had sexual intercourse on defendant's living room couch. Soon thereafter, Levin became agitated and wanted defendant and Shepherd to "hurry up" and return from Chicago with the cocaine. To appease Levin, Hoerer called defendant to inquire about the cocaine. Approximately one hour after placing the first call, Hoerer called defendant again to inform him that Levin was passing out from the methadone. Hoerer testified that defendant was not concerned with Levin's condition and did not instruct him to summon medical assistance. Defendant denied receiving any phone calls from Hoerer about Levin's condition while he and Shepherd were in Chicago.

Shepherd testified that, upon returning to defendant's home, she saw Levin sitting on the living room couch. Levin was unresponsive, but Hoerer and defendant told Shephard that Levin would be "fine" and was merely sedated from the methadone. The group attempted to revive Levin by placing her in a cold shower, but when she remained unresponsive, they returned her to the couch. Shepherd saw that Levin was unconscious but breathing. Shepherd testified that she believed that Levin needed medical assistance when the shower failed to awaken her. Shepherd suggested dialing 911, but Hoerer and defendant refused. Hoerer became infuriated, pushed Shepherd, cursed her, and yanked the telephone cord from the wall to prevent her from calling for help. Hoerer told Shepherd that he had seen Levin's type of reaction to the methadone "a million times" and knew that she would be fine. At one point, defendant placed himself between Hoerer and Shepherd to calm the situation. Defendant told Shepherd to go upstairs to avoid further contact with Hoerer.

Defendant generally corroborated Shepherd's testimony about the group's efforts to revive Levin, but he insisted that only Hoerer objected to calling for help. Defendant testified that, when he and Shepherd initially returned to his home with the cocaine, Hoerer immediately stated that Levin had "gotten into some of [defendant's] medication either when [Hoerer] went to the bathroom or fell asleep." Defendant corroborated Shepherd's description of Hoerer's profane and physical threats.

Hoerer offered yet another account of the group's discussion about summoning help. Hoerer testified that he, defendant, and Shepherd smoked crack cocaine for several hours before Shepherd suggested calling 911. Defendant objected and Hoerer agreed with his assessment of Levin's condition. When the effort to revive Levin in the shower failed, Hoerer stated that it was ultimately defendant's decision not to call 911 because, if help were summoned, the police would likely enter defendant's home. Hoerer denied threatening or making any physical contact with Shepherd.

Shepherd testified that, after her altercation with Hoerer, she went to defendant's bedroom, where she sat on the bed. She testified that defendant gave her a second bottle of methadone because she was "freaking out." Shepherd ingested all of the methadone, became dizzy, and quickly passed out. She recalled waking up with defendant on top of her. Defendant was naked, and it appeared to Shepherd that "he was attempting to have sex with [her]." However, Shepherd admitted that defendant could not achieve an erection and that she was unsure whether "he even had sex with [her]." Shepherd was awakened when Hoerer banged on the bedroom door and said that they had "a f----- problem" because Levin was dead. Shepherd immediately called 911.

Defendant testified that, when he joined Shepherd in his bedroom, she was holding a condom and asked him whether he could "perform," which defendant interpreted as a request for sex. Defendant could not achieve an erection, and Shepherd's attempts to stimulate him orally were unsuccessful. According to defendant, he and Shepherd fell asleep without having sex, and he denied bringing methadone into the bedroom.

A forensic pathology report indicated that Levin died of cocaine and methadone intoxication. Officer Michael Nash interviewed defendant and Shepherd at the scene. Officer Nash testified that defendant told him that Shepherd had wanted to call 911, but Hoerer threatened both of them not to call. Defendant also allegedly told Officer Nash that he and Shepherd engaged in "sex" in his bedroom at about 6 a.m. Officer Nash was not sure whether defendant called the contact "sex" or "sexual intercourse." While at the scene, Officer Nash saw defendant consume an entire bottle of methadone. The police found opened condom wrappers in defendant's bedroom.

Defendant, Shepherd, and Hoerer were transported to the police station where defendant and Shepherd were placed alone in a room together. Shepherd testified that defendant told her "if you protect me, I will protect you. We are in big trouble here and we need to get our stories straight." Defendant allegedly told Shepherd not to mention the methadone and to blame Hoerer for "everything."

Shepherd testified that, following the interview at the police station, she and defendant returned to defendant's home and the two "remained together" until May 29, 2002, when Shepherd stopped speaking to him. Shepherd admitted that for several weeks she did not disclose Levin's methadone use or the alleged criminal sexual assault. However, in July 2002, Shepherd agreed to be interviewed again "to make things right and tell the truth." During this interview she failed to mention defendant's alleged instruction to "protect" him.

Defendant testified that he did not "sexually penetrate" Shepherd, and he denied telling Officer Nash that he had done so. Defendant further denied that he prevented Shepherd from calling 911 or instructed her to "protect him" during the investigation. Defendant insisted that he never believed that Levin would die. Detective Raymond Peters testified that he interviewed defendant at the police station on May 28, 2002. During that interview, defendant provided a statement that was consistent with his testimony at trial.

The jury returned a guilty verdict on all three counts, and the trial court imposed concurrent prison terms of 20 years for drug-induced homicide, 5 years for involuntary manslaughter, and 11 years for criminal sexual assault. Defendant's timely appeal followed.

## II. ANALYSIS

■ The State has moved to strike the footnotes that defendant included in his brief, and we ordered the motion taken with the case. Supreme Court Rule 341(a) limits an appellant's brief to 75 pages and prohibits the use of footnotes to evade the page limitation. 188 Ill. 2d R. 341(a). In this case, defendant has submitted a 64-page brief containing 20 footnotes. The State contends that the footnotes are excessive and contain improper substantive argument with citation to authority. Mindful of the serious nature of the case and the numerous issues presented, we have carefully reviewed the footnotes and conclude that sanctions are unnecessary. We deny the State's motion, accordingly.

We next turn to defendant's allegations of error. He contends that (1) the trial court erroneously declined to sever the criminal-sexual-assault count from the homicide counts; (2) the trial court erroneously admitted evidence of other uncharged sex offenses; (3) the trial court denied him the right to confront Shepherd and Hoerer about their motives to testify for the State; (4) the State failed to prove him guilty beyond a reasonable doubt of criminal sexual assault; (5) the trial court erroneously permitted the State to cross-examine another witness about her telephone conversation with Shepherd three days after the incident; (6) the trial court erred in refusing to instruct the jury that suicide qualifies as an intervening cause of death that relieves a defendant of criminal liability for a homicide; and (7) the drug-induced-homicide statute is unconstitutionally vague and overly broad.

The State and defendant each begin with an analysis of the constitutionality of the drug-induced-homicide statute. However, we recognize that " '[a] court should avoid constitutional questions where the case may be decided on other grounds.' " *In re Detention of Swope*, 213 Ill. 2d 210, 218 (2004), quoting *In re S.G.*, 175 Ill. 2d 471, 479 (1997); see also *People v. Pinkonsly*, 207 Ill. 2d 555, 565 (2003) (supreme court will not consider a constitutional issue in a criminal case if it can be decided on other grounds). We review each of defendant's allegations of trial error and determine that the trial court committed reversible error. In the interest of certitude, we address defendant's constitutional challenge to the drug-induced-homicide statute because he should not be forced to submit to a new trial on that charge if his constitutional arguments are meritorious.

### A. Severing the Criminal-Sexual-Assault Charge From the Two Homicide Charges

■ Defendant argues that the trial court erroneously denied his motion to sever the criminal-sexual-assault charge from the drug-

induced-homicide and involuntary-manslaughter charges. In denying defendant's motion to sever the criminal-sexual-assault charge, the trial court found that the three charges could be tried together because the facts supporting each were "intertwined," occurred at approximately the same time, and were part of the same comprehensive transaction.

A court may order two or more charges to be tried together if the offenses charged are based on the same act or on two or more acts that are part of the same comprehensive transaction. 725 ILCS 5/111—4(a) (West 2004). There are no precise criteria for determining whether separate offenses are part of the same comprehensive transaction. *People v. Gapski*, 283 Ill. App. 3d 937, 942 (1996). Generally, the joinder of two or more charges is appropriate if the offenses are of a similar nature or are part of a single transaction or common scheme. *People v. Weston*, 271 Ill. App. 3d 604, 612 (1995). Among the factors to consider are the proximity in time and location of the offenses, the identity of evidence linking the offenses, the degree to which the offenses share a common method, and whether the severance will promote judicial efficiency. *Gapski*, 283 Ill. App. 3d at 942; *People v. Patterson*, 245 Ill. App. 3d 586, 588 (1993). The circuit court has substantial discretion in deciding whether to sever separate charges, and its decision will not be reversed absent an abuse of discretion. *Weston*, 271 Ill. App. 3d at 612.

Defendant argues that he was prejudiced by the joinder of the sex-offense and homicide charges because they allegedly arose from distinct acts affecting two different victims. Defendant also contends that his trip with Shepherd to Chicago is an intervening event that attenuated the connection between the sex-offense and homicide charges. Defendant argues that *People v. Willer*, 281 Ill. App. 3d 939 (1996), requires a reversal of his convictions and a remand for separate trials on the sex-offense and homicide charges. We agree, concluding that the trial court abused its discretion in finding that the criminal sexual assault and the two homicide counts arose from the same comprehensive transaction.

In *Willer*, the defendant was charged with two counts of aggravated criminal sexual assault and one count of aggravated criminal sexual abuse for vaginally penetrating and fondling one of his daughters several times over an eight-year period. The defendant was charged with one additional count of aggravated criminal sexual abuse for touching another daughter's buttocks once during that period. Defendant was convicted on all counts, and he argued on appeal that the trial court should have severed the charges so that the allegations regarding each daughter would be tried separately. On appeal, this

court reversed the defendant's convictions and remanded the cause for separate trials, holding that the charges pertaining to the two girls were not based on acts that were part of the same comprehensive transaction. *Willer*, 281 Ill. App. 3d at 955.

In *Willer*, we emphasized that, although both daughters were molested in the family home during a single eight-year period, the offenses were only peripherally connected in time and place because one of the daughters was regularly and frequently assaulted while the other was fondled only once. *Willer*, 281 Ill. App. 3d at 951. In this case, the drug-induced homicide was attenuated from the criminal sexual assault. Contrary to the State's assertion, Hoerer's insistence that he called defendant in Chicago and informed him of Levin's condition does not sufficiently connect the drug-induced homicide to the criminal sexual assault because the former allegedly was completed when Levin ingested the methadone, which occurred approximately five hours before defendant allegedly committed the assault. Thus, this factor weighs *in favor* of severing the drug-induced-homicide charge from the criminal-sexual-assault charge. However, the involuntary manslaughter was not so attenuated from the criminal sexual assault because defendant was accused of sexually assaulting Shepherd in his bedroom while *at the same time* failing to help Levin, who was dying in the living room. Thus, this factor weighs *against* severing the involuntary-manslaughter charge from the criminal-sexual-assault charge. However, an analysis of the remaining factors indicates that the best course clearly would be to sever both homicide charges from the criminal-sexual-assault charge.

In *Willer*, we held that the evidence necessary to prove the sex offenses was different for the two victims. Three of the charges alleged that the defendant fondled and had vaginal and oral sex with one of the girls. The fourth charge alleged only that the defendant fondled the other girl's buttocks. Therefore, the evidence necessary to prove each charge was the same only for the two aggravated-criminal-sexual-assault charges. We concluded that there was no similarity between the evidence necessary to prove the aggravated criminal sexual assault of one daughter and the aggravated criminal sexual abuse of the other. *Willer*, 281 Ill. App. 3d at 952. Like in *Willer*, the evidence necessary to prove defendant's guilt differed for the sexual-assault count and the homicide counts.

The alleged drug-induced homicide was completed when defendant knowingly delivered the methadone to Levin and she ingested it. Therefore, no subsequent conduct by defendant, including the alleged criminal sexual assault, was probative to any issue regarding the drug-induced homicide. Whether defendant assaulted Shepherd is irrelevant to whether he committed the drug-induced homicide of Levin.

Defendant's alleged commission of involuntary manslaughter by failing to assist Levin is explained in part by his focus on assaulting Shepherd. However, proof of defendant's failure to assist Levin is satisfied by the undisputed evidence that he assessed Levin's condition and did not help her. The recklessness of this conduct was all that was at issue. Thus, only evidence of defendant's omission was relevant; and evidence of defendant's affirmative act of assaulting Shepherd in the bedroom was unnecessary to proving the involuntary manslaughter. Therefore, the identity-of-evidence factor weighs in favor of severing the sexual-assault charge from the homicide counts.

In *Willer*, we held that the evidence did not establish a common method in the defendant's perpetration of the sex offenses. The evidence showed that, over an eight-year period, the defendant would regularly become intoxicated, enter one daughter's room at 3 a.m., wake her, rub her back and buttocks, remove her pajamas, rub her chest, kiss her, and then penetrate her vaginally. The defendant also attempted oral sex with her approximately 10 times after she turned 8 or 9 years old. By contrast, the defendant fondled the other daughter only once, rubbing her back and bare buttocks one evening at 8 p.m. before she had gone to sleep. *Willer*, 281 Ill. App. 3d at 952. Even though each of the assaults was initiated with a back rub and occurred in the victim's bedroom, we concluded that there were "marked differences" in how the defendant perpetrated the offenses. *Willer*, 281 Ill. App. 3d at 952.

In this case, like in *Willer*, the indictment did not allege that defendant used a common method in committing criminal sexual assault, drug-induced homicide, and involuntary manslaughter. The drug-induced-homicide and involuntary-manslaughter counts were each based on Levin's drug overdose, while the criminal-sexual-assault count was based on Shepherd's inability to consent to sexual penetration. Defendant's initial delivery of methadone to Levin caused her drug overdose, but the second delivery of methadone in the bedroom several hours later caused Shepherd's inability to consent to sexual penetration. We conclude that the two distinct deliveries of methadone do not qualify as a common method of perpetrating the offenses because defendant did not intend for Shepherd and Levin to be victimized in the same way.

Finally, in *Willer*, we accorded little weight to the judicial efficiency achieved by trying the charges together. We noted that judicial efficiency cannot be the main factor in a trial court's decision not to sever charges because the question will always be present when the severance issue arises. We acknowledged that protecting young victims from being forced to testify twice is a worthy goal of judicial efficiency;

however, we concluded that this factor was not implicated because the testimony of each girl would not be admissible in the other's trial if the charges were tried separately. As in *Willer*, the goal of judicial efficiency does not weigh heavily in favor of a single trial in this case. Shepherd, an adult, would have been better equipped than a child to testify twice to the traumatic events of the night in question. Moreover, it is possible that a trial court would exclude as prejudicial any testimony about the assault during a separate trial on the homicide counts.

Despite the deferential standard of review applied to a trial court's decision on these issues, we conclude that the court abused its discretion in denying defendant's motion to sever the criminal-sexual-assault charge from the homicide charges. We next discuss how the court's error on the severability issue was compounded by the admission of the other-crimes evidence and the corresponding jury instruction.

## B. Admission of Uncharged Sex Offenses

Over defendant's objection, the trial court allowed Debra Brounstein and Nicole Semmen to testify to uncharged sex offenses allegedly committed by defendant two to three years before Levin's death. Defendant's challenge to the other-crimes evidence is twofold: he argues that its prejudicial effect outweighed its probative value and that the jury was instructed to consider it for improper purposes. The comparison of prejudicial effect and probative value is best determined in light of the purposes for which the evidence was admitted.

At trial, Brounstein testified that she and defendant had a physical, romantic relationship that ended in December 1999 when she began dating another person. Brounstein became pregnant but chose to terminate her pregnancy in April 2000. One or two days after the procedure, defendant called Brounstein and she agreed to go out with him. On the evening of the date, defendant offered Brounstein a pill that he said would help her sleep. Brounstein took the pill, fell asleep, and awoke with defendant straddling her with his penis in her vagina. Brounstein pleaded for defendant to stop because she was experiencing pain from the abortion, but defendant ignored her and continued until he ejaculated. On cross-examination, Brounstein admitted that she dated defendant several more times and reported the incident only at the request of her boyfriend, who was seeking leniency in his own drug case.

Semmen testified that she met defendant in 2001 and soon began an intimate physical relationship with him. Semmen and defendant shared and abused many drugs during the relationship, including alcohol, cocaine, methadone, and heroin. Four or five times, defendant

provided Semmen with drugs that made her tired and lethargic. Defendant would engage in sexual intercourse with her while she was unconscious from the drugs. On cross-examination, Semmen admitted that she had sexual intercourse with defendant several times when no drugs were involved. Semmen also disclosed that she was once engaged to Levin's uncle and that she reported defendant's sexual misconduct only after Levin died.

Defendant testified that, at the time he met Brounstein in 1997, she routinely used painkillers, cocaine, and possibly heroin. They had consensual sex both with and without sharing drugs, but defendant insisted that he never gave her drugs to facilitate sex. Defendant denied seeing Brounstein in 2000, the year she had an abortion, and he denied that she told him she had one. Brounstein contacted defendant in 2001 or 2002, and they went out several times socially. Defendant denied having sex with Brounstein, Semmen, or anyone else who was in a drugged or unconscious state.

In reviewing the trial court's decision to admit evidence of defendant's other crimes, we briefly summarize the hearings on the issue. Before trial, defendant filed a motion *in limine* to exclude evidence that he "provided drugs to women for the purpose of overcoming any resistence to his sexual advances." Defendant argued that the evidence was remote and irrelevant to whether he delivered methadone to Levin. Defendant conceded that there was an issue as to whether he provided methadone to Levin or Shepherd, and the State characterized this issue as one of identity, which could be shown with other-crimes evidence. After hearing extensive argument, the trial court ruled as follows:

> "[T]he State, for purposes of [proving] *modus operandi*, will be permitted to introduce in rebuttal or to refute any issues of identity should they arise during the defendant's presentation of the case or for impeachment purposes. *** I will bar the State from introducing during their case-in-chief any evidence of other crimes that were committed two to three years prior to the commission of the present offense. However, the State will be allowed to introduce evidence of those crimes in their rebuttal or to refute or during, perhaps, cross-examination of the defendant, should the defendant take the stand, for impeachment purposes and/or to refute the defendant's defense that it wasn't he that gave the methadone."

The court revisited the other-crimes issue at trial when the State called Brounstein and Semmen in its case in chief. Defense counsel argued that evidence of defendant's prior criminal sexual assaults was irrelevant to whether he delivered methadone to Levin. The court stated, "I want to reiterate that there is testimony that the defendant

has denied that he gave the methadone, and as to the identity as to who gave the methadone, it's certainly admissible and relevant." The court also ruled that the other-crimes evidence was admissible to show defendant's propensity to commit criminal sexual assault.

The trial court admitted the testimony of Brounstein and Semmen over defendant's objection. The court initially provided an oral jury instruction, stating "evidence of other crimes as it is presented now before you is received for a limited purpose, and that limited purpose is to establish *identity*, *intent*, and *motive*, so you must at this time *** consider it for that limited purpose." (Emphasis added.) The court later told the jury that it could "also consider this testimony *** regarding the defendant's propensity to commit the crime of criminal sexual assault." The trial court provided an even broader written instruction:

> "Evidence has been received that the defendant has been involved in offenses other than that charged in the indictment. This evidence has been received on the issues of the defendant's propensity to commit the offense of criminal sexual assault, *modus operandi*, motive, intent, opportunity and identity and may be considered by you only for those limited purposes.
>
> It is for you to determine whether the defendant was involved in the offenses, and, if so, what weight should be given to this evidence on the issues of propensity to commit the offense of criminal sexual assault, *modus operandi*, motive, intent, opportunity, and identity."

We note that the written instruction regarding other-crimes evidence distinguishes among the three charged offenses only once. It informs the jury that the evidence is relevant to defendant's propensity to commit criminal sexual assault. From this the jury was to infer correctly that the evidence was *not* relevant to defendant's propensity to commit drug-induced homicide and involuntary manslaughter. See, e.g., *People v. Heard*, 187 Ill. 2d 36, 70 (1999) (evidence of other crimes is not admissible for the purpose of showing the defendant's propensity to engage in criminal activity).

In contrast, the remaining issues cited in the instruction (*i.e.*, *modus operandi*, motive, intent, opportunity, and identity) are not linked to any of the three charged offenses. This lack of particularity in the instruction suggests that the jury was to consider the other-crimes evidence when determining defendant's *modus operandi*, motive, intent, opportunity, and identity in committing criminal sexual assault as well as drug-induced homicide and involuntary manslaughter. During the instruction conference, defendant objected to the written instruction, asserting that the jury should be instructed to disregard the other-crimes evidence entirely.

■ On appeal, the State has completely glossed over the nuances of the written jury instruction. Instead, the State argues that defendant waived any challenge to Brounstein's "unfairly graphic and highly inflammatory" testimony about her terminated pregnancy because he did not object to this "specific testimony" at trial. However, the State concedes that defendant objected generally to all of the other-crimes evidence both in his motion *in limine* and at trial. An issue is preserved for appeal if it is raised either in an objection at trial or in a motion *in limine* and it is also raised in a posttrial motion. *People v. Hudson*, 157 Ill. 2d 401, 434-35 (1993). Because defendant moved *in limine* to exclude the evidence and raised the issue at trial and again in his posttrial motion, he has properly preserved the issue for appeal.

We next turn to the admissibility of the evidence for each of the purposes mentioned in the written jury instruction. A trial court's ruling on the admissibility of other-crimes evidence will not be reversed absent an abuse of discretion. *People v. Childress*, 338 Ill. App. 3d 540, 545 (2003). An abuse of discretion occurs where the trial court's ruling is arbitrary or fanciful, or where no reasonable person would take the view adopted by the trial court. *Childress*, 338 Ill. App. 3d at 545.

### 1. *Criminal Sexual Assault*

■ Defendant contends that his alleged assaults of Brounstein and Semmen were inadmissible to show propensity, *modus operandi*, motive, intent, opportunity, and identity regarding the criminal sexual assault. It is well settled that evidence of other offenses is inadmissible for showing the defendant's disposition or propensity to commit crimes. *People v. Robinson*, 167 Ill. 2d 53, 62 (1995). However, in *People v. Donoho*, 204 Ill. 2d 159, 176 (2003), the supreme court found that section 115—7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115—7.3 (West 2004)) permits a court to admit evidence of other crimes to show a defendant's propensity to commit sex offenses. To be admissible under the statute, the other-crimes evidence should have some threshold similarity to the charged crime. *Donoho*, 204 Ill. 2d at 184. As factual similarities increase, so does the relevance or probative value. *Donoho*, 204 Ill. 2d at 184. However, where such evidence is offered for something other than *modus operandi*, mere general areas of similarity will suffice. *Donoho*, 204 Ill. 2d at 184.

Section 115—7.3 of the Code provides as follows:

"(a) This Section applies to criminal cases in which:

(1) the defendant is accused of predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, aggravated criminal sexual abuse, criminal sexual abuse, or criminal transmission of HIV;

(2) the defendant is accused of battery or aggravated battery when the commission of the offense involves sexual penetration or sexual conduct as defined in Section 12—12 of the Criminal Code of 1961; or

(3) the defendant is tried or retried for any of the offenses formerly known as rape, deviate sexual assault, indecent liberties with a child, or aggravated indecent liberties with a child.

(b) If the defendant is accused of an offense set forth in paragraph (1) or (2) of subsection (a) or the defendant is tried or retried for any of the offenses set forth in paragraph (3) of subsection (a), evidence of the defendant's commission of another offense or offenses set forth in paragraph (1), (2), or (3) of subsection (a), or evidence to rebut that proof or an inference from that proof, may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant.

(c) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances.

(d) In a criminal case in which the prosecution intends to offer evidence under this Section, it must disclose the evidence, including statements of witnesses or a summary of the substance of any testimony, at a reasonable time in advance of trial, or during trial if the court excuses pretrial notice on good cause shown." 725 ILCS 5/115—7.3 (West 2004).

In this case, the other sex offenses occurred within three years of the alleged criminal sexual assault of Shepherd. Furthermore, the offenses were nearly factually identical. Each case involved a dating encounter in which defendant provided the woman with a powerful sedative, waited for her to lose consciousness, and then sexually penetrated her while she was unconscious. These similarities support the trial court's decision to admit the other sex offenses as evidence of defendant's propensity to commit criminal sexual assault, and we conclude that the trial court did not abuse its discretion in doing so.

We further conclude that the trial court did not abuse its discretion in admitting the other-crimes evidence to show defendant's *modus operandi*, motive, intent, and opportunity. Defendant's *modus operandi*, motive, intent, and opportunity were identical in the assaults of Shepherd, Brounstein, and Semmen. Defendant garnered the women's trust in a romantic context and then intentionally delivered a powerful sedative to incapacitate them for the purpose of sexually assaulting

them. The other-crimes evidence was relevant to and probative of the disputed issue of whether defendant incapacitated Shepherd with the methadone to facilitate the assault.

However, we conclude that the trial court abused its discretion in instructing the jury to consider the other-crimes evidence to determine the issue of identity. No one disputes that defendant was in the bedroom with Shepherd at the time of the alleged sexual assault. Therefore, the identity of the accused is not at issue. When a trial court instructs a jury to consider other-crimes evidence to determine unimportant issues, the court diminishes the important questions that are at issue. See *People v. Lenley*, 345 Ill. App. 3d 399, 409 (2003) (because only the issue of the burglar's identity was at issue, the trial court abused its discretion in instructing the jury to consider evidence of the defendant's other burglaries as they related to intent, motive, design, and absence of mistake in the present burglary). In this case, the trial court diminished the importance of the issues of *modus operandi*, motive, intent, and opportunity by instructing the jury to also consider the other-crimes evidence to determine the offender's identity.

As to the criminal-sexual-assault charge, we conclude that the trial court did not abuse its discretion in finding that the probative value of the evidence of *modus operandi*, motive, intent, and opportunity outweighed its prejudicial effect. However, we reach the opposite conclusion regarding the drug-induced-homicide and involuntary-manslaughter charges.

### 2. *Drug-Induced Homicide and Involuntary Manslaughter*

■ Defendant also argues that he is entitled to a new trial because the evidence of his other sex crimes was inadmissible to show *modus operandi*, motive, intent, opportunity, and identity regarding the drug-induced homicide and involuntary manslaughter. While section 115—7.3 of the Code applies to the criminal-sexual-assault charge, the common-law rules of other-crimes evidence apply to the drug-induced-homicide and involuntary-manslaughter charges. "Other-crimes evidence is relevant for *any purpose other* than to show a defendant's propensity to commit a crime." (Emphasis in original.) *People v. Tolbert*, 323 Ill. App. 3d 793, 796 (2001). "This type of evidence is prejudicial because a jury might convict the defendant because it believes that he is a bad person and deserves punishment." *Tolbert*, 323 Ill. App. 3d at 796. Other-crimes evidence may be relevant and admissible, however, for any other legitimate purpose, such as to prove *modus operandi*, the defendant's state of mind, consciousness of guilt, the absence of an innocent frame of mind or the presence of criminal

intent, the circumstances or context of the defendant's arrest, the circumstances of the crime charged that would otherwise be unclear, how an otherwise implausible fact relating to the crime charged arose, the placement of the defendant in proximity to the time and place of the crime, the identification of the weapon used in the crime, whether the crime charged was actually committed, opportunity or preparation, a dislike for or an attitude toward the victim, knowledge, intent, identity, motive, or the absence of mistake or accident. This list should not be taken to mean that these are the only purposes for which evidence of other crimes may be admitted. *Tolbert*, 323 Ill. App. 3d at 797. In fact, our supreme court "has stated that evidence of other crimes is admissible if it is relevant to establish any material issue other than the propensity to commit crime." *Tolbert*, 323 Ill. App. 3d at 797, citing *People v. Stewart*, 105 Ill. 2d 22, 62 (1984). However, the evidence is admissible only if its probative value outweighs the risk of unfair prejudice. *Tolbert*, 323 Ill. App. 3d at 796-97.

"Evidence is relevant if it tends to make the existence of any fact of consequence more or less probable than without the evidence." *Tolbert*, 323 Ill. App. 3d at 797. "It is within the sound discretion of the circuit court to determine whether the evidence of other crimes is relevant to a material issue and whether the probative value outweighs its prejudicial impact." *Tolbert*, 323 Ill. App. 3d at 797.

Other-crimes evidence, although relevant, must not become a focal point of the trial. *People v. Thigpen*, 306 Ill. App. 3d 29, 37 (1999). The trial court should prevent a "mini-trial" of a collateral offense. *People v. Nunley*, 271 Ill. App. 3d 427, 432 (1995). This can be accomplished by the careful limitation of the details of the other crimes to what is necessary to "illuminate the issue for which the other crime was introduced." *Nunley*, 271 Ill. App. 3d at 432.

We conclude that the trial court abused its discretion in admitting the other-crimes evidence for the jury to consider in determining defendant's *modus operandi* in committing drug-induced homicide and involuntary manslaughter. "*Modus operandi*, or 'method of working,' refers to a pattern of criminal behavior so distinct that separate crimes are recognized as the work of the same person. [Citation.] If evidence of other crimes is offered to prove *modus operandi*, there must be some clear connection which creates a logical inference that if defendant committed the former crime, he may have committed the crime charged." *People v. Colin*, 344 Ill. App. 3d 119, 127 (2003).

In this case, there is no connection between defendant's alleged sexual assault of Brounstein and Semmen and the drug-induced homicide and involuntary manslaughter of Levin. Only defendant's delivery of sedatives is common to the offenses, and this delivery is

not so distinct that only defendant could have completed it. The other-crimes evidence was irrelevant to defendant's *modus operandi* in committing the drug-induced homicide and involuntary manslaughter, and there is little question that the prejudicial impact of the evidence was substantial.

We further conclude that the other-crimes evidence was irrelevant to defendant's motive, intent, and opportunity to commit drug-induced homicide and involuntary manslaughter. Nothing suggests that, on the night of the incident, defendant acted with homicidal or romantic motives regarding Levin. When defendant allegedly delivered the methadone to Levin and declined to assist her after the overdose, he did so without the desire or intent to kill or sexually assault her. However, defendant's delivery of sedatives to Brounstein and Semmen was allegedly motivated by his romantic interest in the women. The prejudicial impact of the other-crimes evidence greatly outweighed its relevance to the issues of defendant's motive, intent, and opportunity.

Finally, we conclude that the other-crimes evidence was marginally relevant to the issue of identity, but its prejudicial effect greatly outweighed its probative value. There was no question that defendant is the only person who could have assaulted Brounstein and Semmen as they alleged. Furthermore, it is unquestioned that defendant was present at his home on the night of Levin's death. The only question common to the other crimes and the drug-induced-homicide and involuntary-manslaughter charges is whether the offenses were committed. Because there is no issue that Levin ingested defendant's methadone, the identity of the owner of the methadone is not at issue. However, according to defendant's theory of the case, Hoerer might have delivered the methadone to Levin or she might have found it herself, and therefore, the identity of the possible perpetrator is at issue. Moreover, defendant asserts that Hoerer recklessly failed to assist Levin. Identity was not at issue for the assaults of Brounstein and Semmen, but it is possible that Hoerer could be at least partially culpable for the homicides with which defendant was charged. However, this case does not involve a victim's allegedly mistaken identification of the perpetrator, which would place identity squarely at issue; and the other-crimes evidence is very serious and prejudicial. Therefore, the prejudicial effect of the other-crimes evidence outweighed the probative value of proving identity.

### C. Restriction of Cross-Examination on Witnesses' Motives to Testify

#### 1. *Shepherd*

■ Defendant argues that the trial court committed reversible er-

ror in excluding evidence of Shepherd's motive to testify against him. Defendant contends that, by testifying to her delay in summoning help for Levin, Shepherd exposed herself to criminal liability and would not have done so if she feared prosecution. At trial, defendant attempted to show that Shepherd's former attorney negotiated an agreement with the State, pursuant to which Shepherd would receive immunity in exchange for her testimony. Rather than calling the attorney as a defense witness, defense counsel attempted to introduce this agreement through the cross-examination of Shepherd, who was not a party to the alleged negotiations. The trial court barred the cross-examination, ruling that the testimony was inadmissible hearsay.

Outside the presence of the jury, defense counsel then presented a handwritten note in which the assistant State's Attorney stated: "This is to confirm that Tavia Shepherd is not going to be charged with any criminal offense as a result of the evening during which Ms. Levin died. Our office views her as a victim of the actions of Mr. Hoerer and [defendant]." The note postdated several of Shepherd's statements regarding the group's use of methadone on the night of the incident. The assistant State's Attorney stated that the note did not "suggest anything other than what it says, which is that [the State] did not view [Shepherd] as a potential defendant; that [the State] viewed her as a victim, period."

The right to cross-examine a witness concerning his biases, prejudices, or ulterior motives is protected by both the federal and the state constitutions. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *People v. Ramey*, 152 Ill. 2d 41, 67 (1992), citing *Davis v. Alaska*, 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974). "Moreover, the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. The widest latitude should be given the defense on cross-examination when trying to establish a witness' bias or motive." *Ramey*, 152 Ill. 2d at 67, citing *People v. Gonzalez*, 104 Ill. 2d 332, 337 (1984). " 'Where the defendant's theory is that the prosecution's witness is unbelievable, it is error not to allow the cross-examination on matters which would reasonably tend to show bias, interest or motive to testify falsely. [Citation.] However, evidence of bias, interest or motive must not be remote or uncertain ***.' " (Emphasis omitted.) *People v. Green*, 339 Ill. App. 3d 443, 455 (2003), quoting *People v. Furby*, 228 Ill. App. 3d 1, 3-5 (1992). As noted in *People v. Davis*, 185 Ill. 2d 317 (1998), a defendant need not show that a promise of a special favor has been made to the witness or even that an expectation of a special favor exists in the mind of the witness; rather, the evidence need only give rise to the inference that the witness has something to

gain or lose by testifying. *Davis*, 185 Ill. 2d at 337. Illinois courts have addressed the State's obligations when its witnesses offer testimony in exchange for some beneficial treatment or consideration from the State. In *Davis*, our supreme court held that the limitation placed on the defendant's cross-examination in that case was harmless beyond a reasonable doubt; however, the court cautioned that a trial court has no discretion to deny a defendant the right to cross-examine to show a promise of leniency or promise of a special favor, but has discretion only to preclude repetitive or unduly harassing interrogation on the issue. *Davis*, 185 Ill. 2d at 337, quoting *Ramey*, 152 Ill. 2d at 67.

In this case, defendant produced a handwritten note in which the assistant State's Attorney allegedly informed Shepherd that she would not be charged because the State viewed her as a victim and not as a potential defendant. We conclude that this evidence of Shepherd's possible motive to testify falsely was neither uncertain nor speculative. Although the note, without proper authentication, was inadmissible to prove that the State had, in fact, promised to refrain from charging Shepherd, the cross-examination of Shepherd was appropriate to show how the note affected her state of mind in deciding to testify for the State. The admissibility of the note, or any other basis for Shepherd's state of mind, was irrelevant. The State could have responded to the note by eliciting on redirect examination that it did not affect Shepherd's decision to testify because she received it several months *after* she began cooperating with the investigation. Thus, the jury would have had the opportunity to determine whether Shepherd had something to gain by testifying. See *Davis*, 185 Ill. 2d at 337. Rather than affording defendant the widest latitude in cross-examination to establish Shepherd's bias or motive, the court erred in barring any questions regarding Shepherd's perceptions about prosecutorial leniency. See *Ramey*, 152 Ill. 2d at 67.

### 2. Hoerer

■ Defendant also argues that the trial court erroneously denied him the opportunity to cross-examine Hoerer about his motives to testify falsely. At trial, Hoerer acknowledged that he was under indictment for the criminal sexual assault of Levin based on her inability to consent to sexual intercourse. Hoerer admitted that he was charged with two counts of involuntary manslaughter and one count of delivering methadone, a controlled substance, to Levin. Hoerer also stated that he had negotiated no deal with the State in exchange for his testimony and that, after discussing his legal situation with counsel, he decided to testify because "telling the truth [would] in some way help [his] case."

Defendant argues that he was barred from showing that Hoerer "would say anything to stay out of jail." However, defendant's argument on this point is contained in a single footnote in his opening brief, and he cites no authority to support his position. Therefore, he has waived the issue, and we need not consider it. See 210 Ill. 2d R. 347(h)(7) (points not argued in appellant's brief are waived). However, we briefly note that Hoerer acknowledged providing a written statement, the value of which would determine the plea agreement he might ultimately reach with the State. Thus, the jury heard some evidence of Hoerer's motive to testify for the State.

### D. Sufficiency of the Evidence of Criminal Sexual Assault

■ We next turn to defendant's contention that he was not proved guilty beyond a reasonable doubt of criminal sexual assault. Defendant's challenge focuses on the sufficiency of the evidence as it relates to the language of the charging instrument, which is an issue that might arise again on remand. Defendant was charged with committing criminal sexual assault, in that he, "knowing Tavia Shepard [sic] was unable to give knowing consent, committed an act of sexual penetration with Tavia Shepard [sic], in that [he] *placed his penis in the vagina* of Tavia Shepard [sic], in violation of 720 ILCS 5/12—13(a)(2) [(West 2004)]." (Emphasis added.) Defendant asserts that, to be guilty of sexual penetration, the State had to prove that he "placed his penis in the vagina" of Shepherd because that fact was alleged in the charging instrument. We disagree, concluding that the State was required only to prove the more general allegation that defendant committed an act of "sexual penetration."

Section 111—3(a) of the Code (725 ILCS 5/111—3(a) (West 2004)) sets forth the requirements for the form of a charge and provides in relevant part as follows:

"(a) A charge shall be in writing and allege the commission of an offense by:
(1) Stating the name of the offense;
(2) Citing the statutory provision alleged to have been violated;
(3) Setting forth the nature and elements of the offense charged;
(4) Stating the date and county of the offense as definitely as can be done; and
(5) Stating the name of the accused, if known, and if not known, designate the accused by any name or description by which he can be identified with reasonable certainty." 725 ILCS 5/111—3(a) (West 2004).

To vitiate a trial, a variance between allegations in a charge and

proof at trial " ' "must be material and be of such character as may mislead the accused in making his defense." ' " *People v. Collins*, 214 Ill. 2d 206, 219 (2005), quoting *People v. Davis*, 82 Ill. 2d 534, 539 (1980), quoting *People v. Figgers*, 23 Ill. 2d 516, 518-19 (1962). Where an instrument charges all essential elements of an offense, other matters unnecessarily added may be regarded as surplusage. *Collins*, 214 Ill. 2d at 219.

In this case, the criminal-sexual-assault charge stated the offense, the statutory provision violated, the nature and elements of the offense as defined by the statute, the date and county of the offense, and the name of the accused. Section 111—3(a) required nothing more. We conclude that the words "sexual penetration" were sufficiently specific to inform defendant with reasonable certainty of the offense he was accused of committing. The additional allegation that the specific type of sexual penetration was the placing of defendant's penis in Shepherd's vagina constituted mere surplusage. See *Collins*, 214 Ill. 2d at 219; see also *People v. Ikpoh*, 242 Ill. App. 3d 365, 380-81 (1993).

Defendant argues that the State did not prove that he committed an act of "sexual penetration." When a defendant challenges the sufficiency of the evidence, a reviewing court will reverse the conviction only if, after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). It is the responsibility of the trier of fact to assess the credibility of the witnesses, weigh the evidence, draw reasonable inferences from the evidence, and resolve any conflicts in the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001).

The term "sexual penetration" is defined as *"any contact, however slight,* between the sex organ *** of one person *** [and] the sex organ, mouth or anus of another person, *** including but not limited to cunnilingus, fellatio or anal penetration." (Emphasis added.) 720 ILCS 5/12—12(f) (West 2004). Shepherd testified that when she entered defendant's bedroom, she ingested methadone that defendant provided, fell asleep, and awoke with defendant on top of her. In denying the offense, defendant emphasizes Shepherd's testimony that she did not recall removing her clothing, defendant could not achieve an erection, and she was unsure whether "he even had sex with [her]." However, Shepherd also testified that defendant was naked and "attempting to have sex[ual intercourse] with [her]." Left with the task of assessing the credibility of the witnesses and drawing reasonable inferences from the evidence, the jury could infer from Shepherd's testimony that defendant removed Shepherd's clothing and that their sex organs made "contact, however slight," which is sufficient to sup-

port a finding of sexual penetration. 720 ILCS 5/12—12(f) (West 2004); see *Sorenson*, 196 Ill. 2d at 431. Contrary to defendant's assertion, his apparent inability to achieve an erection is not dispositive of whether any contact occurred. Furthermore, Officer Nash testified that, when the police responded to the 911 call, defendant admitting having "sex" with Shepherd at approximately 6 a.m. We conclude that, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of criminal sexual assault beyond a reasonable doubt. See *Smith*, 185 Ill. 2d at 541.

## E. Admission of Goldman's Third Telephone Conversation With Shepherd

On direct examination by the State, Shepherd testified that, on the night of the incident, Levin was very upset about her failed relationship and damaged car. Shepherd conceded that Levin did not say that she wished to commit suicide. Shepherd recalled discussing Levin's death in two telephone conversations with a friend, Becky Goldman, during the week following the incident. Shepherd denied that she told Goldman that Levin wanted to kill herself and that her death was not preventable. Goldman testified that Shepherd did, in fact, say that Levin wanted to commit suicide. Over defense objection, the trial court permitted Goldman to testify to a third telephone conversation with Shepherd, which occurred between the other two conversations. During the third conversation, Goldman heard defendant in the background "probing Shepherd on what to say."

Defendant contends that the State's cross-examination of Goldman exceeded the scope of the direct examination because the third conversation was "unrelated" to the other two conversations. In a related argument, defendant asserts that the third conversation was introduced for the truth of the matter asserted because "[i]n reality, the State used the third conversation not to attack Goldman['s credibility], but rather to try to show that the defendant was telling Shepherd what to say during the conversation." In other words, defendant argues that he was prejudiced by the admission of the third telephone conversation because it supports an inference that defendant coached Shepherd to falsely report that Levin's death was a suicide.

Cross-examination is generally limited to the subject matter of the direct examination of the witness and to matters affecting the credibility of the witness. *People v. Terrell*, 185 Ill. 2d 467, 498 (1998). However, courts should liberally construe this limitation to allow inquiry into whatever subject tends to explain, discredit, or destroy the witness's testimony. *Terrell*, 185 Ill. 2d at 498. The trial court is

afforded latitude regarding the scope of cross-examination, and a reviewing court should not interfere absent a clear abuse of discretion that results in manifest prejudice to the defendant. *People v. Hall*, 195 Ill. 2d 1, 23 (2000). Improper cross-examination is not reversible error if it can be considered harmless error. *People v. Enis*, 139 Ill. 2d 264, 296 (1990). We conclude that the trial court did not abuse its discretion in permitting the cross-examination regarding the third telephone conversation.

 Shepherd's telephone conversations during the week following Levin's death were the subject of Goldman's direct examination. We conclude that the cross-examination of Goldman, and the introduction of the third conversation, does not exceed the scope of the direct examination because the third conversation relates to the other two conversations. See *Terrell*, 185 Ill. 2d at 498. However, this conclusion does not end our inquiry.

Defendant further argues that the substance of the third conversation violates the rule against hearsay because it was essentially offered to prove that defendant instructed Shepherd to lie about Levin's cause of death. In a footnote, defendant's brief addresses the applicability of the completeness doctrine to Goldman's testimony regarding the third conversation. The completeness doctrine is an exception to the hearsay rule and provides that a party may introduce the balance of a writing or an oral statement that has been introduced by an opponent, for the purpose of explaining, qualifying, or otherwise shedding light on the statement. "However, the completeness doctrine restricts the admissibility of the balance of a statement already introduced ' "to what was said on the same subject at the same time." ' " *People v. Brown*, 249 Ill. App. 3d 986, 990 (1993), quoting *People v. Hudson*, 198 Ill. App. 3d 915, 924-25 (1990), quoting *People v. Hosty*, 146 Ill. App. 3d 876, 884 (1986). The completeness doctrine does not apply if the conversation discussed on direct examination was not a part of the conversation that the opposing party is attempting to introduce on cross-examination. *Brown*, 249 Ill. App. 3d at 990.

In *People v. Brown*, 249 Ill. App. 3d 986 (1993), the defendant made two oral statements at the police station approximately two weeks after the offense. The first statement was given to a sergeant and a detective investigating the crime. Approximately 1½ hours later, the defendant made a second oral statement to the same detective and an assistant State's Attorney. The trial court allowed the assistant State's Attorney to testify to the second statement on direct examination, but the court barred any cross-examination regarding the first statement. The defendant appealed, arguing that the completeness doctrine permitted the introduction of the first state-

ment in which he denied involvement in the crime. The Appellate Court, First District, held that the trial court did not abuse its discretion in excluding the first statement because the two conversations lacked "unity of time and participants." *Brown*, 249 Ill. App. 3d at 991.

This case is distinguishable from *Brown*. Unlike the witness in *Brown*, Goldman was a party to all of the conversations at issue here. Furthermore, we disagree with defendant's contention that the third conversation was unrelated to the other two conversations. Although the three conversations occurred during a one-week period, the trial court viewed the three conversations as a single contemporaneous discussion of Levin's death. The court broadly labeled the topic of Goldman's direct examination as "conversations through phones calls," and in fact, the conversation to which defendant objected occurred between the other two conversations. Furthermore, Goldman's testimony regarding defendant's influence over Shepherd during the third conversation explains the inconsistencies in the testimony of Goldman and Shepherd. In light of the latitude afforded to the trial court in defining the scope of cross-examination, we conclude that the court did not abuse its discretion in permitting Goldman to testify to the third conversation.

We reject defendant's contention that *People v. Hosty*, 146 Ill. App. 3d 876 (1986), compels a different result. In *Hosty*, the witness, who lived with the defendant for a time, came forward with information regarding a murder. The witness had several conversations with the defendant in her home. She testified to conversations she had with the defendant from the date of the murder until the date on which the police placed audio recording devices in her home. The defendant visited the witness's home once or twice after the surveillance equipment was installed, but the trial court barred any cross-examination of the witness regarding those conversations. *Hosty*, 146 Ill. App. 3d at 880.

The defendant appealed, arguing that the completeness doctrine entitled him to use cross-examination to introduce his allegedly exculpatory statements that the police recorded. The Appellate Court, First District, held that the trial court did not abuse its discretion in barring the cross-examination. *Hosty*, 146 Ill. App. 3d at 883. Concluding that the cross-examination would have exceeded the direct examination, the appellate court emphasized that the witness testified to a discrete period during which she spoke with defendant and that the excluded conversations occurred *after* that period. *Hosty*, 146 Ill. App. 3d at 883. In this case, Goldman testified to conversations that occurred during a one-week period, and the third conversation between

134

Goldman and Shepherd occurred during that period. Therefore, this case is factually distinguishable from *Hosty*.

### F. Jury Instructions

■ One of defendant's theories of the case is that Levin deliberately overdosed to commit suicide. Thus, defendant contends that the trial court erred in rejecting his nonpattern jury instruction that stated that suicide is an intervening cause of death that could relieve defendant of criminal liability. The purpose of jury instructions is to provide the jurors with the legal principles that apply to the evidence so they can reach a correct verdict. *People v. Hopp*, 209 Ill. 2d 1, 8 (2004). "Jury instructions should not be misleading or confusing." *People v. Pinkney*, 322 Ill. App. 3d 707, 717 (2000). "[T]here must be sufficient evidence in the record to support an instruction, lest the jury be confused by issues improperly before it." *Pinkney*, 322 Ill. App. 3d at 717.

Supreme Court Rule 451(a) provides that whenever the Illinois Pattern Jury Instructions (IPI) contain an applicable jury instruction, and the court determines that the jury should be instructed on the subject after giving due consideration to the facts and law, "the [IPI instruction] shall be used[ ] unless the court determines that it does not accurately state the law." 177 Ill. 2d R. 451(a). Where there is no IPI jury instruction on a subject on which the court determines the jury should be instructed, the court has the discretion to give a non-pattern instruction. *People v. Ramey*, 151 Ill. 2d 498, 536 (1992). A trial court's decision on whether to use a non-IPI instruction should not be disturbed absent an abuse of that discretion. *People v. Pollock*, 202 Ill. 2d 189, 211 (2002). Whether the court has abused its discretion in giving a particular instruction will depend on whether it was an accurate, simple, brief, impartial, and nonargumentative statement of the applicable law. 177 Ill. 2d R. 451(a); *Pollock*, 202 Ill. 2d at 211.

Defendant offered a non-IPI jury instruction that stated as follows:

> "There is evidence that the deceased, Nicole Levin, expressed an intent to commit suicide shortly before her death. Suicide can be an intervening cause of death completely unrelated to the acts of the defendant. If you find that the deceased came to her death by her own conduct, her death was not caused by a criminal agency."

The trial court rejected defendant's instruction and instead used the cause-of-death instruction provided in Illinois Pattern Jury Instructions, Criminal, No. 7.15 (3d ed. 1992) (hereinafter IPI Criminal 3d). IPI Criminal 3d No. 7.15 states as follows:

> "In order for you to find that the acts of the defendant caused the death of [the victim], the State must prove beyond a reasonable

doubt that defendant's acts were a contributing cause of the death and that the death did not result from a cause unconnected with the defendant. However, it is not necessary that you find the acts of the defendant were the sole and immediate cause of death."

Citing the testimony of Levin's father that his daughter did not appear suicidal on the night of her death, the State argues that there was "no evidence" to support defendant's proposed instruction regarding suicide as an intervening cause of death. However, the jury also learned that, during the four months preceding Levin's death, she ended her relationship with her boyfriend, she suffered a miscarriage, she was hospitalized four times for attempting suicide and intentionally overdosing on alcohol and prescription medication, and she injured herself and a passenger in a drug- and alcohol-related car accident. Shepherd testified that, on the night of Levin's death, she was noticeably upset about her failed relationship and the damage to her car. Shepherd also testified that Levin said that "[s]he had nothing left to live for."

Causation is a question of fact that should be left to the trier of fact (*People v. Brackett*, 117 Ill. 2d 170, 177 (1987)), and the jury heard evidence that Levin was a victim of either homicide or suicide. Therefore, we agree with defendant that an instruction addressing her cause of death was appropriate, but we agree with the State that the trial court did not abuse its discretion in using IPI Criminal 3d No. 7.15.

Defendant's instruction, though simple and brief, is not impartial because it unnecessarily emphasizes Shepherd's testimony that Levin expressed an interest in committing suicide before her death. By comparison, the committee note to IPI Criminal 3d No. 7.15 states that the pattern instruction should be given whenever causation is at issue. IPI Criminal 3d No. 7.15, Committee Note, at 174. "The cases that are cited by the committee [also] suggest that the instruction was created to be given where an intervening and alternative explanation for the cause of death is argued by the defense." *Pinkney*, 322 Ill. App. 3d at 718. At trial, defendant presented suicide as an intervening and alternative explanation for Levin's death. The trial court did not need to use the term "suicide" when instructing the jury because IPI Criminal 3d No. 7.15 encompasses suicide as an intervening and alternative cause of death. In fact, the pattern instruction is more accurate than defendant's proposed instruction because it allows liability for an act that may be *a* proximate cause though not necessarily the *only* proximate cause. Under these circumstances, we conclude that the trial court did not abuse its discretion in using IPI Criminal 3d No. 7.15.

### G. Multiple Homicide Convictions for Single Death

Although the parties have not addressed the propriety of multiple convictions of drug-induced homicide and involuntary manslaughter, we address the issue because it will likely arise on remand. We further note that our analysis discloses a deficiency in the charging instrument. The jury found defendant guilty of drug-induced homicide and involuntary manslaughter. The trial court entered convictions and imposed sentences for both charges even though they were directed toward the same victim. Pursuant to the "one-act, one-crime" rule, multiple convictions are improper if based upon the same physical act. *People v. Latto*, 304 Ill. App. 3d 791, 806 (1999). Whether multiple convictions violate the rule is a question of law, which we review *de novo. Village of Sugar Grove v. Rich*, 347 Ill. App. 3d 689, 698 (2004).

In *People v. King*, 66 Ill. 2d 551, 566 (1977), our supreme court held that a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act. There are two steps to a *King* analysis. *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). First, the court ascertains whether the defendant's conduct consisted of a single physical act or separate acts. *Rodriguez*, 169 Ill. 2d at 186. An "act" is any overt or outward manifestation that will support a separate offense. *King*, 66 Ill. 2d at 566. "Multiple convictions are improper if they are based on precisely the same physical act." *Rodriguez*, 169 Ill. 2d at 186.

Second, if the defendant committed multiple acts, the court determines whether any of the offenses is a lesser-included offense. *Rodriguez*, 169 Ill. 2d at 186. If any of the offenses is a lesser-included offense, then, under *King*, multiple convictions are improper. *Rodriguez*, 169 Ill. 2d at 186. If none of the offenses is a lesser-included offense, then multiple convictions may be entered. *Rodriguez*, 169 Ill. 2d at 186.

In *People v. Barcik*, 357 Ill. App. 3d 1043 (2005), we held that the defendant's convictions of two counts of driving under the influence (DUI) and two counts of driving while his license was revoked (DWLR) violated the one-act, one-crime rule because the defendant received multiple convictions for one act of drunken driving and multiple convictions for one act of driving while his license was revoked. Similarly, in *People v. Palmer*, 346 Ill. App. 3d 942, 952 (2004), we held that the defendant could not be convicted of two counts of aggravated criminal sexual assault where there was only one act of sexual penetration.

In *People v. Fuller*, 205 Ill. 2d 308 (2002), the defendant argued that his convictions of knowing and felony murder (720 ILCS 5/9—1(a)(2), (a)(3) (West 1996)) must be merged into the single most

culpable murder count, intentional murder (720 ILCS 5/9—1(a)(1) (West 1996)), because there was only one death. The State confessed error, and our supreme court agreed, restating the well-settled rule that "[i]f only one person has been murdered, there can be but one conviction for murder; only the conviction for the most culpable charge will be upheld, while the other less culpable murder charges must be vacated." *Fuller*, 205 Ill. 2d at 346.

In this case, the drug-induced-homicide charge alleged a death caused by the ingestion of a controlled substance knowingly delivered by defendant. In contrast, the involuntary manslaughter charge alleged that defendant recklessly "performed an act likely to cause death or great bodily harm" in that he "failed" to request emergency medical assistance. Although the parties do not raise the issue, we note that the involuntary manslaughter charge incorrectly fails to even mention an unintentional death. Therefore, the charging instrument is deficient. See 720 ILCS 5/9—3(a) (West 2004) ("[a] person who *unintentionally kills an individual* \*\*\* commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly" (emphasis added)). Defendant has waived the issue by failing to object. See *People v. Davis*, 352 Ill. App. 3d 570, 573 (2004). We note that, on remand, defendant may be recharged with involuntary manslaughter as long as the charge mentions the unintentional death and otherwise complies with the requirements of a charging instrument.

If the involuntary-manslaughter charge is so modified on remand and defendant is found guilty of drug-induced homicide and involuntary manslaughter, the one-act, one-crime rule would preclude multiple convictions because only one person was killed. Because drug-induced homicide is a Class X felony (720 ILCS 5/9—3.3(b) (West 2004)) and involuntary manslaughter is only a Class 3 felony (720 ILCS 5/9—3(d)(1) (West 2004)), a conviction could be entered on only the drug-induced-homicide charge, which is the more culpable offense. See *Fuller*, 205 Ill. 2d at 346.

## H. Consecutive Sentences

We also address whether a prison term imposed for criminal sexual assault must be served consecutively to another prison term imposed for drug-induced homicide or involuntary manslaughter. The State argues that such consecutive sentences are mandated by section 5—8—4(a)(ii) of the Unified Code of Corrections (Code of Corrections) (730 ILCS 5/5—8—4(a)(ii) (West 2004)). Rather than replying to the merits of the State's argument, defendant argues that the inevitable

reversal of his convictions renders the sentencing issue moot. We address the issue because it might arise on remand.

Supreme Court Rule 604(a)(1) provides that the State may appeal only from an order or judgment in a criminal case that results in dismissal of a charge; "arresting judgment because of a defective indictment, information or complaint; quashing an arrest or search warrant; suppressing evidence; decertifying a prosecution as a capital case ***; or finding that the defendant is mentally retarded." 210 Ill. 2d R. 604(a)(1). Ordering the circuit court to impose consecutive sentences could result in a prohibited expansion of the State's limited right to appeal in a criminal case. See *People v. Robinson*, 267 Ill. App. 3d 900, 906 (1994). However, in *People v. Arna*, 168 Ill. 2d 107, 113 (1995), the supreme court held that "[a] sentence which does not conform to a statutory requirement is void" and that the "appellate court had the authority to correct it at any time." The State has raised the issue of mandatory sentencing without filing a cross-appeal, but we may consider the issue if defendant's sentence is void.

Section 5—8—4(a)(ii) of the Code of Corrections provides in relevant part as follows:

"(a) When multiple sentences of imprisonment are imposed on a defendant at the same time, *** the sentences shall run concurrently or consecutively as determined by the court. *** The court shall impose consecutive sentences if:

***

(ii) the defendant was convicted of a violation of Section 12—13 [(criminal sexual assault)], 12—14 [(aggravated criminal sexual assault)], or 12—14.1 [(predatory criminal sexual assault of a child)] of the Criminal Code of 1961[.]" 730 ILCS 5/5—8—4(a)(ii) (West 2004).

In this case, the requirements for mandatory consecutive sentences will be met if the trial court imposes multiple sentences for criminal sexual assault and for drug-induced homicide or involuntary manslaughter. See 730 ILCS 5/5—8—4(a)(ii) (West 2004).

## I. Constitutionality of Drug-Induced-Homicide Statute

We decide that trial error requires us to reverse the judgment and remand the cause for further proceedings. However, we comment on defendant's allegation of the unconstitutionality of the drug-induced-homicide statute because the issue likely will arise on remand. Defendant contends that the drug-induced-homicide statute is unconstitutionally vague and overbroad.

A statute is presumed constitutional. The party challenging the statute bears the burden of demonstrating its invalidity. *People v. Mal-*

*chow*, 193 Ill. 2d 413, 418 (2000). A court has a duty to construe a statute in a manner that upholds its constitutionality if it can be done reasonably, and any doubt must be resolved in favor of the statute's validity. *Malchow*, 193 Ill. 2d at 418. The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature. The best indication of the legislature's intent is the language of the statute, which should be given its plain, ordinary, and popularly understood meaning. *People v. Jackson*, 358 Ill. App. 3d 927, 933 (2005). The question of a statute's constitutionality is subject to *de novo* review. *People v. Carney*, 196 Ill. 2d 518, 526 (2001).

A person commits drug-induced homicide if he "violates Section 401 of the Illinois Controlled Substances Act [(the Act) (720 ILCS 570/401 (West 2004))] by unlawfully delivering a controlled substance to another, and any person dies as a result of the injection, inhalation or ingestion of any amount of that controlled substance." 720 ILCS 5/9—3.3(a) (West 2004). Section 401 of the Act provides that "[e]xcept as authorized by this Act, it is unlawful for any person *knowingly* to: (i) manufacture or deliver, or possess with intent to manufacture or deliver, a controlled or counterfeit substance or controlled substance analog." (Emphasis added.) 720 ILCS 570/401 (West 2004). Methadone is a Schedule II controlled substance under the Act (720 ILCS 570/202, 206(c)(14) (West 2004)), and defendant does not dispute that section 401 of the Act barred him from delivering methadone to Shepherd, Levin, or Hoerer.

### 1. *Overbreadth*

Defendant asserts that the drug-induced-homicide statute was designed to punish only "professional drug dealers" and, therefore, the possibility that anyone in the chain of delivery might be criminally liable renders the statute unconstitutionally overbroad.

" 'The doctrine of overbreadth is designed to protect first amendment freedom of expression from laws written so broadly that the fear of punishment might discourage people from taking advantage of the freedom.' " *People v. Hill*, 333 Ill. App. 3d 783, 786 (2002), quoting *People v. Bailey*, 167 Ill. 2d 210, 226 (1995). "A statute regulating conduct is overbroad if it (1) criminalizes a substantial amount of protected behavior, relative to the law's plainly legitimate sweep; and (2) is not susceptible to a limiting construction that avoids constitutional problems." *Hill*, 333 Ill. App. 3d at 786. When considering a claim of overbreadth, we must first determine whether the statute inhibits conduct protected by the first amendment. *Hill*, 333 Ill. App. 3d at 786.

One may challenge a statute as overbroad only if the statute may

inhibit the exercise of rights of expression or association protected by the first amendment. *Bailey*, 167 Ill. 2d at 226, citing *Broadrick v. Oklahoma*, 413 U.S. 601, 611-12, 37 L. Ed. 2d 830, 839-40, 93 S. Ct. 2908, 2915-16 (1973). In this case, defendant has not alleged that the drug-induced-homicide statute implicates any first amendment safeguard. Therefore, defendant's overbreadth argument is not well taken. In arguing that the statute is capable of inconsistent enforcement, defendant apparently confuses the doctrines of vagueness and overbreadth because he cites authority that addresses only the vagueness doctrine: "[I]n reviewing whether a statute is vague, a court may also consider the legislative purpose and the evil that the statute is designed to remedy." *People v. Maness*, 191 Ill. 2d 478, 486 (2000). We consider each of defendant's arguments in the context of the vagueness doctrine.

## 2. *Vagueness*

Due process requires that the proscriptions of a criminal statute be clearly defined. "The statute must provide a person of ordinary intelligence a reasonable opportunity to distinguish between lawful and unlawful conduct so that he or she may act accordingly." *Maness*, 191 Ill. 2d at 483-84. " ' "No one may be required at peril of life, liberty, or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." ' " *Maness*, 191 Ill. 2d at 483-84, quoting *City of Chicago v. Morales*, 177 Ill. 2d 440, 450 (1997), *aff'd*, 527 U.S. 41, 144 L. Ed. 2d 67, 119 S. Ct. 1849 (1999), quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 83 L. Ed. 888, 890, 59 S. Ct. 618, 619 (1939). "[T]he statute must provide sufficiently definite standards for law enforcement officers and fact finders that its application does not depend merely on their private conceptions." *People v. Hickman*, 163 Ill. 2d 250, 256 (1994). Although due process requires that a statute must not be "so vague" that persons of common intelligence must necessarily guess at its meaning or application, mathematical certainty in language is not required. *People v. Warren*, 173 Ill. 2d 348, 356 (1996). "To prevail on a vagueness challenge to a statute that does not implicate first amendment concerns, a party must demonstrate that the statute was vague as applied to the conduct for which the party [was] prosecuted." *Bailey*, 167 Ill. 2d at 228.

## a. Legislative Intent

Defendant argues that the statute is vague because its language does not reflect the legislature's intent "to stop drug traffickers, the professional drug dealers." When considering whether a statute is vague, we assume, absent a contrary legislative intent, that the

statute's words have their ordinary and popularly understood meanings. In addition to those words, we must consider the legislative objective and the evil that the statute is designed to remedy. *People v. Fabing*, 143 Ill. 2d 48, 54 (1991); *Hill*, 333 Ill. App. 3d at 788.

Defendant correctly points out that the legislature did not expressly set forth the purpose of the statute. However, we reject defendant's assertion that the statute is unconstitutional for failing to specify "dealers" as the intended targets of prosecution. The drug-induced-homicide statute applies to any person who violates section 401 of the Act by knowingly "delivering" a controlled substance. In the context of the statute, "delivery" is defined as the actual, constructive, or attempted transfer of a controlled substance, *with or without consideration*, whether or not there is an agency relationship. 720 ILCS 570/102(h) (West 2004). Citing isolated portions of the legislative history in which legislators refer to "manufacturer[s], dealer[s], and suppliers," defendant argues that the statute was not intended to punish the last person in the chain of delivery. However, the plain language of the statute is the best indication of the legislature's intent. If the legislature had intended to limit the statute to apply only to "dealers" or wholesale distributors of controlled substances, it would have used those terms and defined them. Instead, the statute uses the term "delivery," which is statutorily defined. We conclude that the drug-induced-homicide statute is not unconstitutionally vague for failing to more precisely define the class of persons to whom it applies.

## b. Mental State

Defendant argues that the drug-induced-homicide statute is unconstitutionally vague because it does not specify what mental state subjects an accused to criminal liability. In *People v. Faircloth*, 234 Ill. App. 3d 386, 391 (1992), we were faced with the issue of whether involuntary manslaughter is a lesser-included offense of drug-induced homicide. In analyzing this issue, we identified the mental state that must be proved to sustain a conviction of drug-induced homicide:

> "The drug-induced homicide statute is a unique statute that imposes criminal responsibility for the death of a person on anyone in the chain of delivery of controlled substances that were the cause of that person's death. *** The mental state in this statute is 'knowingly,' which comes from section 401 of the Controlled Substances Act of 1971 [citation], which prohibits a knowing manufacture, possession, or delivery of a controlled substance. The defendant just needs to make a knowing delivery of a controlled substance, and if any person then dies as a result of taking that substance, the defendant is responsible for that person's death." *Faircloth*, 234 Ill. App. 3d at 391.

We adhere to our conclusion in *Faircloth* that the drug-induced-homicide statute incorporates the "knowing" mental state element from section 401 of the Act. Our holding is supported by the approach Illinois courts have taken in determining the mental state element of felony murder (720 ILCS 5/9—1(a)(3) (West 2004)). Felony murder derives its mental state from the underlying intended offense. Felony murder seeks to deter persons from committing forcible felonies by holding them responsible for murder if a death results. A defendant may be found guilty of felony murder regardless of a lack of intent to commit murder. *People v. Johns*, 345 Ill. App. 3d 237, 242 (2003). Just as the felony murder statute imposes criminal liability for a death resulting from a forcible felony, the drug-induced-homicide statute imposes criminal liability for a death resulting from the knowing delivery of certain controlled substances. We conclude that, like the felony-murder statute, which derives its mental state from the underlying intended offense, the drug-induced-homicide statute derives the "knowing" mental state element of delivery under section 401 of the Act.

### c. Foreseeability of Death

Defendant contends that, if the drug-induced-homicide statute derives its mental state from section 401 of the Act, the statute is unconstitutionally vague because it does not specify the degree to which the resulting death must be foreseeable. In response to a similar vagueness challenge to the absence of a foreseeability requirement in the felony murder statute, our supreme court held that "when a felon's attempt to commit a forcible felony sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, he should be held responsible for any death which by direct and almost inevitable sequence results from the initial criminal act." *People v. Lowery*, 178 Ill. 2d 462, 467 (1997) (affirming the defendant's felony murder conviction as reasonably foreseeable where the intended victim of an armed robbery shot and killed an innocent bystander). Under the proximate cause theory of criminal liability, "liability attaches 'for any death proximately resulting from the unlawful activity.' " *People v. Dekens*, 182 Ill. 2d 247, 249 (1998), quoting *Lowery*, 178 Ill. 2d at 465.

Defendant argues that the drug-induced-homicide statute is unconstitutional because "[i]n contrast to the felony murder statute, the drug-induced-homicide statute lacks any requirement that the death arise as a 'foreseeable consequence' or proximate result of the defendant's 'inherently dangerous' conduct, but instead criminalizes any death of any person who uses any quantity of drugs provided by

the defendant in violation of section 401 of [the Act]." The State responds that, because the drug-induced-homicide and felony-murder statutes similarly incorporate the mental state of their respective underlying offenses, we should also read the proximate cause element of the felony murder statute into the offense of drug-induced homicide. We hold that the drug-induced-homicide statute is satisfied by a showing that the death was proximately caused by the delivery of the controlled substance.

We note that the evidence presented at trial supports a finding that defendant's knowing delivery of the methadone proximately caused Levin's death. See *Bailey*, 167 Ill. 2d at 228 (to prevail on a vagueness challenge to a statute that does not implicate first amendment concerns, a party must demonstrate that the statute is vague as applied to the conduct for which the party was prosecuted); see also *Johns*, 345 Ill. App. 3d at 242 (Illinois adheres to a proximate cause approach to felony murder liability). Shepherd testified that the four sat in defendant's living room, where defendant retrieved several bottles of methadone from a hollowed-out book and a gray lockbox. Defendant placed the bottles on a glass table and told the group that the bottles contained methadone and that methadone is a safer form of heroin. According to Shepherd, Levin drank one bottle and then the remaining portion of another that Shepherd rejected. Hoerer corroborated this portion of Shepherd's testimony. Moreover, a medical expert testified that Levin died of cocaine and methadone intoxication. Defendant contends that Levin's death was not proximately caused by his conduct because he did not "encourage" Levin to ingest the methadone. However, the evidence presented is sufficient to sustain the conviction because the State was required to prove only that defendant's delivery of methadone was "knowing." We conclude that, after viewing the evidence in the light most favorable to the State, any rational jury could find beyond a reasonable doubt that defendant's knowing delivery of the methadone proximately caused Levin's death.

## III. CONCLUSION

While the evidence was not overwhelming, the evidence was sufficient to sustain convictions of criminal sexual assault and of drug-induced homicide or involuntary manslaughter. Based on a thorough review of the record, we cannot say, viewing all of the evidence in the light most favorable to the prosecution, that defendant has demonstrated that the evidence was so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of his guilt. For the preceding reasons, the judgment of the circuit court of Lake County is reversed and the cause is remanded for further proceedings consistent

144

with this opinion. Double jeopardy is not implicated because there is sufficient evidence to prove defendant guilty beyond a reasonable doubt. See *People v. Taylor*, 76 Ill. 2d 289, 309-10 (1979). In light of the remand for retrial, an analysis of the remaining arguments raised by defendant on appeal is unnecessary.

Reversed and remanded with directions.

O'MALLEY, P.J., and McLAREN, J., concur.