No. 2—09—0404
Opinion filed February 23, 2011

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08—CM—7016 |
| MARGARET CURTIS, | ) ) | Honorable Clarke C. Barnes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Justices McLaren and Hudson concurred in the judgment and opinion.

**OPINION**

Defendant, Margaret Curtis, also known as Peggy Curtis, appeals from her conviction of one count of violating the duties of an animal owner pursuant to section 3(d) of the Humane Care for Animals Act (the Act) by "knowingly and unlawfully failing to provide humane care and treatment" to her pet cat. See 510 ILCS 70/3(d) (West 2008). On appeal, defendant contends that: (1) section 3(d) of the Act is unconstitutionally void for vagueness; (2) the State failed to prove beyond a reasonable doubt that she did not provide humane care and treatment to her cat; and (3) the trial court erred when it calculated the imposed fines and, thus, those fines should be reduced. We affirm.

Defendant lived in a two-bedroom townhouse apartment with 87 cats. Five cats that were personally owned by defendant remained in her bedroom, while the other eighty-two cats were located elsewhere throughout the residence. Defendant claimed that the 82 cats were not owned by her, but were strays that had come to her door. Defendant, fearing for the stray cats' safety, provided them with food, water, and shelter. On September 8, 2008, defendant called an animal control facility to remove all the cats. The animal control facility was asked to keep a particular black cat separate from the other cats because that cat was "special to the owner." That cat had a respiratory tract infection and was euthanized. Defendant was subsequently charged with violating her duties as an animal owner because of her treatment toward that particular cat.

Defendant was initially charged with two counts of violating her duties as an animal owner pursuant to sections 3(c) and (d) of the Act. See 510 ILCS 70/3(c), (d) (West 2008). Section 3 of the Act provides:

"Owner's Duties. Each owner shall provide for each of his animals:

(a) sufficient quantity of good quality, wholesome food and water;

(b) adequate shelter and protection from the weather;

(c) veterinary care when needed to prevent suffering; and

(d) humane care and treatment." 510 ILCS 70/3 (West 2008).

Count I alleged that defendant knowingly and unlawfully failed to provide sufficient veterinary care to prevent suffering to the particular black cat. See 510 ILCS 70/3(c) (West 2008). Count II alleged that defendant knowingly and unlawfully failed to provide humane care and treatment for the same particular black cat. See 510 ILCS 70/3(d) (West 2008).

On March 13, 2009, a bench trial was held in the matter. At the trial, the State's evidence established that on September 8, 2008, three animal control officers went to defendant's residence because she reportedly wished to release some cats to them.

Deputy Stacy testified that defendant's residence contained two upstairs bedrooms and had a kitchen and a living room on the main floor. Ten to fifteen cats were present when the officers entered defendant's residence. Stacy testified that she found approximately 50 "wild-like" cats in one of the bedrooms. She testified that the bedroom "had a[n] ammonia odor. There was a strong smell of cat urine and feces." According to Stacy's testimony, the bedroom contained two litter boxes. Stacy testified that she and her colleagues grabbed the cats with a special tool and placed them in cages. Stacy testified that many of the cats suffered from an upper respiratory tract infection and that this was "very typical of inbreeding."

Stacy testified that in the second bedroom she found only five cats. These cats were more docile than the cats in the other bedroom; they were easy to capture. This bedroom contained one litter box. Stacy testified that, in total, the animal control officers removed 87 cats from defendant's residence.

Stacy testified that one particular black cat, with the identification number A209057, was brought to the animal control facility separately from the other cats. Stacy testified that she believed that defendant brought that cat to the facility two days later.

Investigator Mace, who also worked for animal control, testified that defendant signed an animal release form for the 87 cats. He testified that there were a total of four litter boxes in defendant's residence. He further testified that the cats he observed in the animal control facility were "feral, like stray cats."

The expert witness testimony of veterinarian Loren Gambrel was admitted. Gambrel testified that he examined the cats taken from defendant's residence. He testified that many of the cats had upper respiratory tract infections, evident because the cats had discharge around their eyes and noses. Gambrel testified that, on September 10, 2008, he examined the black cat with identification number A209057. Gambrel testified that cat A209057 suffered from an upper respiratory tract infection and that he treated the infection with antibiotics. Gambrel further testified that upper respiratory tract infections in cats have an incubation period of 5 to 10 days. Gambrel opined that no more than five cats should reside in a single place to ensure a healthy environment for the animals. He testified that upper respiratory tract infections can continue circulating, being repeatedly passed from cat to cat, so that, in an overcrowded environment, none of the cats can ever recover. On cross-examination, Gambrel acknowledged that azithromycin is a medication used to treat upper respiratory infections in cats.

The State rested, and defendant moved for a directed finding, arguing that the prosecution failed to prove that cat A209057 belonged to defendant. The trial court denied defendant's motion.

Veterinarian Bruce Probst of the Boone County Family Pet Clinic testified on behalf of defendant. He testified that defendant brought her cats into the clinic for treatment. He testified that defendant first came to the clinic in July 2007. Probst identified Exhibit DX1 as defendant's veterinary records from the clinic. Probst testified that he treated defendant's cat Baby Boy with azithromycin for a respiratory infection. He testified that the prescription for the antibiotic was refilled several times. Probst testified that defendant brought "different cats [into the clinic] at different times." When asked whether defendant attempted to take good care of the cats she brought in, Probst responded that "she tried to help them."

Defendant testified that she owned five cats. She testified that the other cats removed from her residence did not belong to her. She testified that the other cats "just came to the door at night" because they were hungry or thirsty. She testified that she did not turn the cats away, because otherwise "Olson's dogs would kill them." She testified that her five cats received veterinary care. Defendant denied that she brought a cat to animal control on September 10, 2008, or on any other date. She testified that she would have had to sign a separate release form if she brought any animal to the animal control center.

After the defense rested, the State informed the trial court that it was surprised by defendant's testimony and asked for a continuance so that it could present rebuttal testimony from a kennel supervisor. The trial court granted the State's request. On March 20, 2009, the trial resumed. The State moved to reopen its case-in-chief, rather than to present rebuttal testimony. The trial court allowed the State's motion.

Gary Longanecker, the director of animal services for Winnebago County, testified that on September 8, 2008, he helped to collect the cats from defendant's residence. Longanecker testified that he drove a van full of cats from defendant's residence to the animal control kennels. Longanecker testified that he was told that one particular cat was special to the owner and needed to be kept separate from the others; he did not specify who conveyed this information to him. Longanecker put that cat into its own carrier. At animal services, Longanecker transferred custody of all the cats to the kennel workers. He testified that he told Sandra Tejada, the kennel supervisor, that a particular cat was "special to the owner and was supposed to be kept from the majority of the cats." On cross-examination, Longanecker admitted that, although he knew that the particular cat

came from defendant's residence, he did not know from where in her home it came. He admitted that he did not give the cat an identification number.

Kennel supervisor Sandra Tejada testified that the procedure used by staff at the facility was that animals were given impound numbers when they arrived at the kennel. Tejada testified that, on September 8, 2008, she assigned number A209057 to a black cat. Tejada testified that she was told that the cat was "a personal cat to the owner" and was to be "treated differently than the rest of the cats." Cat A209057 was placed in an isolated area but was later euthanized.

On March 20, 2009, following arguments by the parties, the trial court found defendant guilty on count II, failure to provide humane care and treatment to cat A209057. She was found not guilty of count I, failure to provide veterinary care. On that same day, the trial court sentenced defendant to 24 months' conditional discharge and 2 days in jail, with credit for 1 day served. The conditional discharge order stated that defendant was not to own any companion animals and that she would be subject to a monthly search of her residence by Winnebago County animal services. The trial court also imposed on defendant various assessments, including a $20 criminal/traffic surcharge and an $8 victim's-fund fine. Defendant filed a motion for a new trial, which the trial court denied on April 3, 2009. Defendant timely appealed.

Defendant first contends that section 3(d) of the Act is unconstitutionally void for vagueness, as applied. See 510 ILCS 70/3(d) (West 2008). Defendant argues that the statute fails to provide adequate notice to animal owners of the steps they must take to provide "humane care and treatment" and fails to define the offense in a manner that would prevent arbitrary and discriminatory enforcement. The State counters that the burden is on defendant to demonstrate the statute's invalidity and that defendant's argument fails to do so.

Although defendant did not present this claim in the trial court, a challenge to the constitutionality of a statute may be raised for the first time on appeal. *People v. Wooters*, 188 Ill. 2d 500, 510 (1999). The federal and state constitutions mandate that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, §2. "Due process of law" requires that the proscriptions of a penal statute be clearly defined. *City of Chicago v. Morales*, 177 Ill. 2d 440, 448 (1997).

A statute is presumed constitutional and the party challenging the statute bears the burden of demonstrating its invalidity. *People v. Boand,* 362 Ill. App. 3d 106, 138-39 (2005) (citing *People v. Malchow*, 193 Ill. 2d 413, 418 (2000)). Reviewing courts have a duty to construe the statute in a manner that upholds its constitutionality if it can be done reasonably, and any doubt must be resolved in favor of the statute's validity. *People v. Larson*, 379 Ill. App. 3d 642, 650 (2008) (citing *Boand*, 362 Ill. App. 3d at 139, citing *Malchow*, 193 Ill. 2d at 418). The fundamental principle of statutory construction is to ascertain and give effect to the legislature's intent. *Larson*, 379 Ill. App. 3d at 650 (citing *People v. Pierce*, 226 Ill. 2d 470, 475-76 (2007), citing *People v. Pack*, 224 Ill. 2d 144, 147 (2007)). The language of the statute is the best indication of the legislature's intent, and it should be given its plain and ordinary meaning. *Larson*, 379 Ill. App. 3d at 650 (citing *Pierce*, 226 Ill. 2d at 476, citing *Pack*, 224 Ill. 2d at 147). Where the statute is clear and unambiguous, we must apply it as written, without resort to extrinsic aids of statutory construction. *Larson*, 379 Ill. App. 3d at 650 (citing *People v. Collins*, 214 Ill. 2d 206, 214 (2005)). We further note that the traditional canons or maxims of statutory construction are not rules of law, but rather are "merely aids in determining legislative intent and must yield to such intent." *Larson*, 379 Ill. App. 3d at 650 (citing *In re Application of the County Treasurer*, 214 Ill. 2d 253, 259 (2005)). The constitutionality of a statute

is a question of law, subject to *de novo* review. *Larson*, 379 Ill. App. 3d at 650 (citing *Boand*, 362 Ill. App. 3d at 139, citing *People v. Carney*, 196 Ill. 2d 518, 526 (2001)).

"A statute is void for vagueness only if it fails to (1) 'provide the kind of notice that would enable a person of ordinary intelligence to understand what conduct is prohibited,' or (2) 'provide explicit standards for those who apply it, thus authorizing or even encouraging arbitrary and discriminatory enforcement.' " *Larson*, 379 Ill. App. 3d at 650 (quoting *People v. Law*, 202 Ill. 2d 578, 582-83 (2002)). "Whether a statute is void for vagueness must be determined in the factual context of each case." *Larson*, 379 Ill. App. 3d at 650 (citing *People v. Falbe*, 189 Ill. 2d 635, 639 (2000)). "The tests for assessing whether a law is vague are not capable of mechanistic application." *Larson*, 379 Ill. App. 3d at 650 (citing *City of Chicago v. Pooh Bah Enterprises, Inc.*, 224 Ill. 2d 390, 443 (2006)). However, in any context, " 'there are limits to the degree of precision attainable by the English language.' " *Larson*, 379 Ill. App. 3d at 650 (quoting *City of Chicago*, 224 Ill. 2d at 444). "In *Ward v. Rock Against Racism*, 491 U.S. 781 *** (1989), the United States Supreme Court recognized that 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.' " *Larson*, 379 Ill. App. 3d at 650 (quoting *Ward*, 491 U.S. at 794). "Moreover, 'when judging the constitutionality of a rule or statute, common sense cannot and should not be suspended.' " *Larson*, 379 Ill. App. 3d at 650 (quoting *City of Chicago*, 224 Ill. 2d at 444, citing *Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006)).

Thus, section 3(d) of the Act must satisfy two requirements to comport with the standards of due process. First, the statute's prohibitions must be sufficiently definite, when measured by common understanding and practices, to inform a person of ordinary intelligence what conduct is lawful and what conduct is unlawful. See *Larson*, 379 Ill. App. 3d at 650; see also *People v. Izzo*,

195 Ill. 2d 109, 113 (2001). Second, the statute must provide " 'sufficiently definite standards for law enforcement officers and triers of fact such that its application does not depend merely on their private conceptions.' " *Larson*, 379 Ill. App. 3d at 650-51 (quoting *Izzo*, 195 Ill. 2d at 113). So long as a defendant's conduct clearly falls within the statutory proscription, a defendant may be prosecuted under the statute in harmony with due process, even though the statute may be vague as to other conduct. *Larson*, 379 Ill. App. 3d at 651 (citing *Izzo*, 195 Ill. 2d at 113).

In the present matter, this court is asked to determine whether defendant's conduct constituted inhumane care and treatment to cat A209057 as a person of ordinary intelligence would understand it. We determine that a person of ordinary intelligence would consider defendant's conduct toward cat A209057 inhumane.

Here, defendant allowed 82 feral cats into her two-bedroom townhouse, creating an unsanitary environment for her pet cat A209057. Testimony adduced at trial established that the presence of such a significant number of animals in an enclosed space made cat A209057 more susceptible to disease and chronic infection. The evidence showed that the bedroom containing approximately 50 cats smelled strongly of urine and feces and that the residence contained only four litter boxes. Many of the cats suffered infections. Cat A209057 suffered an infection so severe that it led to its demise. Although defendant may have believed that she was saving the stray cats from certain death, a reasonable person would understand that her actions caused cat A209057 to exist in an unsanitary environment where the cat became so sick that animal control personnel deemed it necessary to euthanize the animal. Common sense tells us that defendant's actions were inhumane. See *Larson*, 379 Ill. App. 3d at 650-51 (holding that, in making a determination as to whether a statute is void for vagueness, common sense should not be suspended, and criminal acts cannot

always be defined with absolute precision because of the limits of the English language). Thus, we determine that a person of ordinary intelligence would be aware that confining over 80 stray cats to a single townhouse residence would jeopardize the health and sanitary living conditions of the pets on the premises and, in this case, constituted inhumane treatment to cat A209057.

We further determine that section 3(d) of the Act provides sufficiently definite standards for unbiased application by both law enforcement officers and triers of fact. Merriam-Webster's Dictionary defines "humane" as "marked by compassion, sympathy, or consideration for humans or animals." Merriam-Webster Online Dictionary (2010), available at http://www.merriam-webster.com/dictionary/humane (last visited Feb. 23, 2011). Defendant cites the comparable statutes of other states in support of her position. We note that, under those statutes, defendant's conduct would still be considered inhumane. The Georgia Code states that " '[h]umane care' of animals means, but is not limited to, the provision of adequate heat, ventilation, sanitary shelter, and wholesome and adequate food and water." Ga. Code Ann. §4—11—2(4) (West 2010). Virginia defines "humane" as "any action taken in consideration of and with the intent to provide for the animal's health and well-being." Va. Code Ann. §3.2—6500 (West 2010). Law enforcement officers and triers of fact are bound to the plain and ordinary meaning of the language of the statute. See *Larson*, 379 Ill. App. 3d at 650 (citing *Pierce*, 226 Ill. 2d at 476, citing *Pack*, 224 Ill. 2d at 147). Here, the plain and ordinary meaning of the statute explicitly denotes defendant's conduct as inhumane. Defendant's conduct lacked consideration and compassion for cat A209057, in that it deprived the cat of sanitary living conditions, free of disease. Even under the definitions used by other states, defendant's conduct would be explicitly considered inhumane in that she failed to provide cat A209057 with sanitary shelter and failed to consider cat A209057's health and well-being.

Under the plain and ordinary meaning of the statute, law enforcement officers are provided with explicit standards to apply the law in a nondiscriminatory manner. Defendant's conduct falls within the statutory proscription, and thus she may be prosecuted under the statute in harmony with due process. See *Larson*, 379 Ill. App. 3d at 651 (citing *Izzo*, 195 Ill. 2d at 113).

We must presume that the statute is constitutional and defendant bears the burden to establish a constitutional violation. *Boand,* 362 Ill. App. 3d at 138-39 (citing *Malchow*, 193 Ill. 2d at 418). Defendant, here, failed to satisfy this burden. Thus, we conclude that, as applied here, section 3(d) of the Act is not unconstitutionally void for vagueness.

Defendant next contends that the State failed to prove beyond a reasonable doubt that defendant did not provide humane care and treatment to cat A209057. The State counters that the evidence adduced at trial sufficiently proved beyond a reasonable doubt that defendant failed to provide humane care and treatment to cat A209057.

We must determine "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). To determine whether the evidence adduced at the bench trial proved beyond a reasonable doubt that defendant failed to provide humane care and treatment to cat A209057, we view the evidence in the light most favorable to the prosecution. See *Cunningham*, 212 Ill. 2d at 280. We determine that the evidence adduced at trial was sufficient to prove beyond a reasonable doubt that defendant failed to provide humane care and treatment to cat A209057.

In the current matter, the trial evidence showed that 87 cats were removed from defendant's two-bedroom residence. Many of the cats had upper respiratory tract infections, including cat A209057. Testimony at trial reflected that cat A209057 was "severely infected" with an upper

respiratory tract infection and had to be euthanized. Gambrel testified that no more than five cats should be kept in one residence to ensure a healthy environment for the animals. He testified that upper respiratory tract infections can continue circulating, being repeatedly passed from cat to cat, so that, in an overcrowded environment, none of the cats can ever recover. Here, it can be reasonably inferred that defendant maintained an unhealthy environment for cat A209057 in which it contracted a severe upper respiratory tract infection. See *Cunningham*, 212 Ill. 2d at 280 (the requirement that a reviewing court must view the evidence in the light most favorable to the prosecution, when determining sufficiency of the evidence to convict, includes allowing all reasonable inferences from the record in favor of the prosecution). In the present matter, defendant failed to protect her pet, cat A209057, from a disease that would have been both preventable and treatable had she not allowed an excess of 80 stray cats into her residence.

Furthermore, defendant's conduct of calling the animal control office and authorizing the animal control facility to remove and take custody of all 87 cats indicates that she was aware that she was unable to provide any of the cats with adequate humane care and treatment. We note that defendant specifically relinquished custody of cat A209057 to the facility, indicating that she knew that cat A209057 was living in inhumane conditions. Here, defendant recognized that she could not provide humane care to cat A209057 and took action to save the animal from her inability to properly care for it. While it appears unfortunate that the authorities chose to prosecute her for those efforts, and we note that the State's conduct serves as a deterrent to others considering peacefully relinquishing pets for which they cannot provide adequate care, defendant's awareness that she was unable to provide humane care and treatment to cat A209057 can be inferred from her decision to release her pet to the animal control authority. See *Cunningham*, 212 Ill. 2d at 280 (the requirement

that a reviewing court must view the evidence in the light most favorable to the prosecution, when determining sufficiency of the evidence to convict, includes allowing all reasonable inferences from the record in favor of the prosecution). Thus, we conclude that the evidence adduced at trial was sufficient to prove beyond a reasonable doubt that defendant failed to provide cat A209057 with humane care and treatment.

Defendant's third contention is that the trial court erred when it calculated the imposed fines and thus those fines should be reduced. Specifically, defendant argues that the trial court's order for fines, fees, and costs must be reduced by $14. She asserts that, because her other fines totaled $34, only a $10 criminal/traffic surcharge and a $4 victim's-fund assessment were statutorily authorized. The State responds that defendant's fines were properly calculated.

Although this issue was not raised by defendant's trial counsel in a motion to reconsider sentence, defendant asserts that, because the amounts imposed were not statutorily authorized, the order is void. See *People v. Dobbs*, 353 Ill. App. 3d 817, 830 (2004). A void order may be attacked at any time. *People v. Thompson*, 209 Ill. 2d 19, 27 (2004). Because the question of statutory authorization presents a matter of law, our review is *de novo*. *People v. Robinson*, 172 Ill. 2d 452, 457 (1996).

In the present matter, the fines that defendant argues were improperly calculated are both determined by reference to the amount of other fines. See 725 ILCS 240/10(b) (West 2008) (requiring an "additional penalty of $4 for each $40, or fraction thereof, of fine imposed"); 730 ILCS 5/5—9—1(c) (West 2008) (requiring an "additional penalty of $10 for each $40, or fraction thereof, of fine imposed").

Defendant bases her argument on her claim that her other fines totaled $34; thus, according to defendant, she should have been assessed only a $10 criminal/traffic surcharge and a $4 victim's-fund assessment. The record reflects that defendant was assessed a $34 circuit-clerk fine, a $10 mental-health-court fee, and a $10 child-advocacy fee. The latter two assessments, however, are also considered fines, giving defendant a total of $54 in other fines. See *People v. Graves*, 235 Ill. 2d 244, 248-54 (2009) (determining that the mental-health-court fee constituted a fine); *People v. Jones*, 397 Ill. App. 3d 651, 660-61 (2009) (determining that, pursuant to *Graves*, the child-advocacy fee was a fine for purposes of calculating the victim's-fund assessment). Therefore, pursuant to section 10(b) of the Violent Crime Victims Assistance Act (725 ILCS 240/10(b) (West 2008)) and section 5—9—1(c) of the Unified Code of Corrections (730 ILCS 5/5—9—1(c) (West 2008)), defendant was to be assessed $8 for a victim's-fund assessment and $20 for a criminal/traffic surcharge. Thus, we conclude that defendant's fines were properly calculated.

For the forgoing reasons, we affirm the judgment of the circuit court of Winnebago County.

Affirmed.